(June 24, 2008)

In the Matter of KADIATOU B., a Child Alleged to be Neglected. FATAMATOU N.-B. et al., Respondents; ADMINISTRATION FOR CHILDREN'S SERVICES, Appellant. [861 NYS2d 20]—

Order, Family Court, Bronx County (Clark V. Richardson, J.), entered on or about June 27, 2006, which, after a fact-finding hearing, dismissed a derivative neglect petition against respondent parents, unanimously affirmed, without costs.

The record evidence supports Family Court's dismissal of the derivative neglect petition at issue. The court's prior finding of *child abuse*, which is the basis of that petition, was based upon vague, nonspecific evidence as to the earlier death of respondents' three-month-old baby (who was also named Kadiatou) in

1999, and the parents have since demonstrated a positive change in circumstances. It should be noted that the court was particularly familiar with the evidence in this case inasmuch as it had also presided over the predicate 2002 abuse case and the 2005 Family Court Act § 1028 hearing.

As this Court has stated, proof of the abuse or neglect of one child "may, in appropriate circumstances, be sufficient to sustain a finding of abuse or neglect" of a second child (*Matter of Cruz*, 121 AD2d 901, 902 [1986]). We further stressed, however, that the "determinative factor is whether, taking into account the nature of the conduct and any other pertinent considerations, the conduct which formed the basis for a finding of abuse or neglect as to one child is so proximate in time to the derivative proceeding that it can reasonably be concluded that the condition still exists" (*id.* at 902-903). Other relevant factors include whether the conduct upon which the prior finding was based "supports the conclusion that the parents have a faulty understanding of the duties of parenthood" (*Matter of Christina Maria C.*, 89 AD2d 855 [1982]), and whether sufficient positive change in the parents' behavior has occurred (*see Matter of Kimberly H.*, 242 AD2d 35, 39 [1998]).

Initially, the prior conduct that resulted in the 2002 finding of abuse—the 1999 death of three-month-old Kadiatou and the severe injury to her twin sister, Aisstou—some seven years earlier, is, under the circumstances, sufficiently remote in time from the petition at issue. Although there is no hard and fast rule governing time proximity, the underlying abuse finding was inconclusive as to the parents' role. In fact, the record sheds no light on "the nature of the conduct." Rather, the conduct relating to Kadiatou's death supporting the prior abuse finding was never defined, and neither of the respondents was ever found to have committed an intentional, reckless or even negligent act against the children; nor was either of the respondents found to have been responsible for their injuries. Indeed, neither parent was ever charged with any criminal conduct. Rather, the finding was reached solely on the basis of the legal construct res ipsa loquitur. Hence, the record contains no specific evidence as to whether the prior abuse finding supports the conclusion that respondents had a faulty understanding of their parental duties. This case is thus distinguishable from *Matter of Justice T.* (305 AD2d 1076 [2003], *lv denied* 100 NY2d 512 [2003]), where a longer time interval was found not to be remote because such faulty understanding was evidenced by the parent's conviction for egregious intentional conduct that occurred while she was receiving rehabilitative services due to prior allegations of abuse.

It is also distinguishable from *Matter of Umer K.* (257 AD2d 195 [1999]), where there was criminal responsibility imposed on the parents for the abuse, and strong expert testimony supporting the continued inability of the parents to care for the child.

With respect to the injuries causing Kadiatou's death in 1999, the only evidence offered by Administration for Children's Services (ACS) was the records of the Medical Examiner that were received at the fact-finding hearing. The cause of death was stated as "homicide" and, specifically, "blunt impact to [the] head." The records indicate that Kadiatou was born prematurely, at 24 weeks gestation, and died on November 18, 1999, at the reported age of 3½ months. She had suffered multiple fractures and other injuries to her skull and head. At least three and possibly four skull fractures (the records are ambiguous in this regard) were observed, as well as subscapular, subdural and subarachnoid hemorrhages.

Although ACS urges on appeal that the injuries were inflicted on more than one occasion, there is no such finding in the record. Moreover, ACS did not offer any testimony from a representative of the Office of the Medical Examiner either to explain the homicide finding or to opine on the injuries. Rather, to support this legal conclusion, ACS relies on references in the records to the effect that the fractures were "healing" and certain of the hemorrhages were "fresh, recent and organizing."*

Unquestionably, the death of respondents' infant child is extremely disturbing. But like Family Court, we cannot blink at ACS' failure to present any testimony bearing on the issue of whether Kadiatou's skull fractures occurred at separate times, or whether her fatal injuries were the result of intentional conduct by a caregiver, let alone one of the respondents in particular. Indeed, there is no basis in the record to identify which of the respondents Kadiatou was with, or even whether she was with one of them, when she suffered the fatal injuries.

In addition, no evidence was presented that dismissing the petition would be harmful to the welfare of the subject child, now three years old. There is a plethora of evidence to the contrary regarding the parents' positive behavior. In its comprehensive and well-reasoned written opinion, Family Court agreed with the caseworker that respondents "complied with each and

---

* ACS also relies on a treatise on forensic pathology, which states that "considerable force" is necessary to cause a fracture to an infant's skull (Spitz and Fisher, Medicolegal Investigation of Death, at 707 [3rd ed 1993]). The term "considerable" force, however, is unilluminating and, of course, "considerable force" can be inflicted accidentally and without committing homicide.

every element of the service plan" jointly devised by ACS and New York Foundling, a child and family services agency, to wit: "They engaged in and completed parenting skills courses, they engaged in a course of treatment of individual psychotherapy and they visited regularly with [the surviving twin] Aisstou, reportedly not missing a single visit. Indeed, not only did the Respondents complete that which was asked of them, they continued with services of their own accord thereafter, thereby building upon the foundation which those services offered by ACS had set."

Furthermore, since 2002, respondent mother has undergone individual counseling at Harlem Hospital, and learned sufficient English to allow her to undergo individual psychotherapy, which she successfully completed. She enrolled and participated in the Nah We Yone Program, which provides family services, counseling and a women's wellness support network to immigrant and displaced Africans. Nah We Yone also provided a social worker who successfully taught the mother how to play games, read and relate to Aisstou, who was five years old at the time. By way of contrast, when the deceased child and Aisstou were born, the mother was only 15 years old, shy and withdrawn, had only recently arrived in the United States, spoke no English, and her support network consisted of her husband and one friend. The father has also received parenting skills training and individual counseling, and more recently was participating in family counseling. The parents have been active in Nah We Yone as a couple, both clinically and socially.

Observations, by the caseworker and social workers, of the parents' interactions with Aisstou and the subject child have been positive. Indeed, as Family Court also noted, the caseworker "pointedly stated that she saw no parenting issues with the parents." Moreover, in October 2005, during the pendency of this matter in Family Court, ACS discharged Aisstou from foster care to the custody of her parents without prior consultation with the Family Court. As Family Court observed, that determination by ACS "clearly manifest[s] the Agency's belief that the parents have overcome whatever problems existed in the past, are capable of caring for a child and are not exhibiting any fundamental defect in judgment." Concur—Lippman, P.J., Andrias, Williams and McGuire, JJ.